UNITED STATES

v.

**Harold H. KRAUSS, 419 76 4876, Staff Sergeant (E–6), U.S. Marine Corps.**

NMCM 84 3934.

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 6 Oct. 1983.

Decided 24 May 1985.

LCDR Frederick N. Ottie, JAGC, USN, Appellate Defense Counsel.

LT Daniel Lippman, JAGC, USNR, Appellate Defense Counsel.

LTCOL Stephen S. Mitchell, USMC–R, Appellate Government Counsel.

LCDR David A. Sabot, JAGC, USN, Appellate Government Counsel.

Before GREGORY, MITCHELL and BARR, JJ.

MITCHELL, Judge:

The appellant stands convicted by general court-martial of dereliction of duty, twelve counts of treasury check theft ($1700 total face value) and twelve counts of check forgery. He incurred an approved sentence extending to a bad conduct discharge, confinement for two years, forfeiture of all pay and allowances for two years and reduction to pay grade E–1.

The known facts are that the appellant (who had prior experience at the Marine Corps Finance Center), while assigned to an Inspector and Instructor Staff (I–I), served as administrative chief and had responsibility for receiving and auditing reservists' pay checks. In July of 1982, the first sergeant found a stack of paychecks in the appellant's safe, conducted an audit against the paycheck log book and then ordered the appellant to return the checks to the Finance Center. The appellant, according to his confession, said he found the checks in his safe after returning from leave and proceeded to find out why the checks were issued and to make appropriate corrections in the computerized pay system which was newly in effect at the time. The "system" continued to send checks for reservists that he was trying to get removed from the pay system. In July the appellant took some checks and other mail matter to the Post Office for mailing. The envelope with the checks fell between the seats of his car and was found by him several weeks later. The appellant, who claimed to be having financial and domestic problems, made a false I.D. card in the name of M.L. Gonzales, to which he laminated his own picture. He then took one of the checks, on which he forged an endorsement by the stated payee to M.L. Gonzales, executed an endorsement in the name of M.L. Gonzales, and then opened an account at a nearby bank. He then deposited the Government payroll checks in and withdrew funds from that account over the next few weeks. At least two of the checks so deposited were not part of the original batch of checks but were taken after the first sergeant's audit. The appellant's confession indicates that he believed that, if he had not alerted the Finance Center and cashed the checks, his scheme would not have been discovered.

But, alas, the spectre of Murphy's First Law arose. Around 18 October 1982, the appellant withdrew funds from the account but forgot to sign the withdrawal slip. This error was discovered by a teller's supervisor who returned the slip to the teller. About 20 October 1982, the appellant came back into the bank to make another deposit and after so doing was asked by the teller to sign the withdrawal slip which he forgot to sign on 18 October. Without hesitation the appellant signed the slip. Later the teller gave the slip to her supervisor who noticed that the signature was not "M.L. Gonzales" but, unfortunately, "Harold Krauss." The appellant's scheme unravelled to his detriment. Against this factual background, the appellant complains that the Government failed at trial to prove beyond a reasonable doubt that he was mentally responsible for the offenses involved.

At the outset it is noted that the task of dealing with apparently conflicting psychiatric and psychological experts is made simpler by a clear understanding of the difference between law and medicine. The law is not concerned with the precise medical definition of insanity as is true of medicine. The physician's purposes of definition are to identify a *medical* problem (in this case a psychiatric one) and to grade its *medical* significance, so it can be intelligently discussed and treated. The psychiatrist uses terminology and processes which are useful to that purpose. The law, on the other hand, in its substantive provisions and the judgment of the trier of fact, is concerned with defining the degree of mental impairment that will excuse crime. It is not surprising that the lawyer and the psychiatrist will often encounter a certain confusion as they try to communicate across their differing perspectives, and as a result they often, perhaps unwittingly, confuse their roles in the trial. The lawyer must be aware that there are infinite gradations of sanity, that psychiatry is not a precise sci-

ence and that psychiatric terminology does not have universal meaning. The criminal law cannot realistically adjust to infinite gradations of human mental weakness. The law is, however, designed to protect the more extreme case from unjust punishment because of a mental condition over which the person has no control. It is also significant that psychiatric training often involves the input of a deterministic philosophy which negates the concepts of free will and culpability which form the basis of the criminal law.

In this arena of confusion, the facts bearing upon the claimed mental condition and those surrounding the commission of the charged offenses predominate in serving the purpose of the criminal law. Consequently, there is a great necessity to avoid allowing the labels used by the medical experts to themselves be outcome determinative, since the same labels are often used differently by different psychiatrists and are not by themselves relevant to the criminal law's purpose. In the case at bar, this is especially true in respect to the words "crazy," "mental disease," "mental defect," "mental illness", "obsession," and "compulsion," for the appellant relies too heavily on these labels in petitioning for relief and the meanings attending those words are not standard among the testifying experts. The state of the evidence in this case, however, permits an accurate judgment to be made in respect to whether this appellant is to be excused of his crimes.

In 1979, the appellant, while serving in Hawaii with Marine Air Control Squadron 2, 1st Marine Brigade, experienced a fainting reaction while giving a blood sample during a physical examination. He was given a neurological examination which confirmed the malady and ruled out any sort of neurological or seizure disorder.

About May of 1980, the appellant's marriage began to fall apart. This situation had an adverse effect upon the appellant's prior excellent performance as administrative chief, as subsequently noted by his reporting senior. In September of 1980, the appellant visited a medical doctor with complaints of weight loss, upset stomach and nervousness. He was given a psychiatric consult for a perceived situational reaction. An evaluation was undertaken in November by a psychologist who believed that the appellant had an extreme situational reaction caused by marital turmoil and related emotional difficulty in accepting his inability to control his wife's behavior. By this time the appellant had found his wife living with a gunnery sergeant in Government quarters. He had complained to the Provost Marshall and the Housing Office and had filed charges with the staff judge advocate, all without apparent success. He had also complained in writing about this to the Brigade Commander. Continued therapy was recommended by the psychologist to prevent deterioration of appellant's coping skills.

In December of 1980 the appellant saw the Brigade Commander twice and was satisfied that a significant portion of his problem had been rectified. The appellant later said that at that time he felt ready to resume his customary high level of performance. He was transferred from MACS 2 on 19 January 1981 because the command believed that appellant's preoccupation with his personal problems unacceptably interfered with his performance in the high operational stress environment of the squadron and that transfer to another squadron which had a less stressful environment would afford him the time to work out his domestic problems. The 1 June 1980–19 January 1981 fitness report marks were all average and above, with straightforward written comments. The appellant rebutted this report in an aggressive, articulate and reasoned letter. His performance at his new squadron was apparently satisfactory or better, since he was reenlisted for five years while there. In April of 1981, he was transferred in normal course to the I–I in San Bernardino, California.

The appellant's performance as administrative chief from 16 April 1981–30 June 1981 was considered excellent to outstand-

ing, as reflected in the change of reporting senior fitness report of that period. The new I-I (and reporting senior) was apparently more authoritarian than his predecessor. The appellant subsequently said that from the beginning he knew life would be difficult. The appellant's performance deteriorated and was substandard in many respects, as reflected in his salt and pepper 1 July 1981–31 January 1982 fitness report. (The I-I attributed this decline to a preoccupation with family problems). The appellant received nonjudicial punishment during this period for failing to stand inspection, failing to timely post colors and unauthorized absence from duty. On 16 September 1982, the appellant rebutted this report with an aggressive, articulate and reasoned letter excusing his offenses by typically heard explanations, attributing all to family problems (which he this time claimed had not been resolved) and claiming the existence of a personality clash between himself and the new I-I.

On 29 June 1982, the appellant's performance of duty was such that the I-I relieved him from his duties as administrative chief and assigned him to clerical duties. About this time he also wrote a request mast letter to the Commanding General, 4th Marine Division, in which he laid blame on the I-I, praised himself and asked for help. His 1 February–29 June 1982 fitness report was "unsatisfactory" and "below average" in many respects. Specific reference was made to security derelictions, inaccurate record keeping and failure of a general inspection of his area of responsibility. This report, drafted originally on 8 July 1982, was delayed until October 1982 at the request of Captain Nelson, MC, U.S. Navy, who had been appellant's psychiatrist from 1 July 1982, and who was concerned about the mental anguish the report might cause appellant when he perceived his career was in jeopardy (even though the appellant was already aware of these matters). The appellant's rebuttal of this report was written on 15 November 1982. It was thoughtful, coherent, articulate and reasoned but was more contrite than his previous writings.

In September of 1982, the appellant requested transfer for the good of the service because of the alleged personality clash between himself and the I-I. This request was favorably endorsed by the I-I, the District I-I and the Commanding Officer, 23d Marines, after they each had talked to Captain Nelson and the appellant and had determined that Captain Nelson did not have an accurate picture of the situation or the relationship which actually existed between the I-I and the appellant. It was, of course, during September 1982 that the appellant began to cash the payroll checks. On 20 September, the appellant was ordered to stay away from the drill center in order to relieve the dissension created by him.

In October 1982, the I-I formally forwarded a request for relief of the appellant for cause, setting forth a "laundry list" of additional deficiencies, derelictions, and offenses, including a letter of indebtedness and the appellant's sporadic attempts to resolve it; hidden ADTAKE messages sent to the I-I from higher headquarters pertaining to appellant's responsibility areas and a less than candid explanation for their sequestration by the appellant; failure to follow information disclosure orders in a sensitive casualty assistance matter; a finding by an external administrative inspection team that appellant had caused low morale in his section and another unauthorized absence of about six days. This action, originally begun in June of 1982, was also stalled by the intervention of Captain Nelson. The appellant was investigated and interrogated by the Secret Service in connection with the instant offenses, ultimately confessing on 29 October 1982.

Charges were preferred on 9 February 1983. The pretrial investigation began on 24 March and, when evidence was taken on 3 May, the appellant was represented by the same civilian lawyer who defended him at trial. In April, the appellant visited Dr. R.T. MacLeod, a civilian osteopath and psychiatrist, and did so on several occasions thereafter. He also was evaluated by Mr. Wolfgang Klebel, a civilian psychologist.

Both were aware of Captain Nelson's involvement with the appellant and, along with Captain Nelson, testified at trial on the appellant's behalf.

The defense lead witness was Navy psychiatrist Captain J.N. Nelson, who had been counselling the appellant since 1 July 1982 for what appellant's health record states was a diagnosed situational reaction to stress due to family problems and a personality clash with the I–I. At trial in October 1983, Captain Nelson said that the appellant, though not psychotic or out of touch with reality, was experiencing a severe obsessive compulsive personality disorder [1] before, at and after the time of the offenses. He considered the personality disorder a mental disease or defect though candidly admitting that whether this was actually so depended on how one defined "mental disease" or "defect." Captain Nelson said that the appellant desperately tried to do everything right but at a certain level of stress he ceased to think clearly, indulged in bizarre thinking, and became nervous, anorexic, anxious and upset even to the point of losing physiological control, citing (without apparent basis) the 1979 Hawaii fainting spell as a stress reaction. When confronted by a problem under stress, appellant's lack of clear thinking limited his ability to see all alternative solutions. The appellant weighed the alternatives he could see and selected the solution he deemed best. This solution then became an "obsession" and the appellant could see nothing but attaining the goal identified in his solution. Captain Nelson was of the opinion that (during this thought process) appellant could well distinguish right from wrong. Once the solution was determined, however, the appellant, in Captain Nelson's opinion, was compelled to follow it regardless of the risk or certainty of failure. This latter aspect of appellant's thought process was opined to be beyond his power to control because of his personality. In those situations where the appellant decided upon a course of action which involved wrongful conduct, Captain Nelson believed that the appellant first convinced himself that what he was doing was right by way of recharacterization or rationalization of the behavior and, when that was done, compulsion took the helm and drove the appellant onward much like a goal directed servo-mechanism. As examples of this thought process and appellant's bizarre thinking, Captain Nelson related the following:

1. In November of 1982, the appellant told Captain Nelson that he was going to drive his car, which was said to be inoperable and graced with four tires worn paper thin, to the east coast to pick up his son, drive back to Denver, then return his son to the east coast and return to the west coast. Seeing his son was the obsession. The solution to drive the foregoing route became the obsession. The appellant, upon learning that Captain Nelson had made arrangements for the trip to include Navy Relief money, declined the help in spite of Captain Nel-

1. An obsessive compulsive disorder is a rare anxiety disorder characterized by recurrent obsessions (recurrent persistent ideas, thoughts, images or impulses which invade consciousness and are experienced as senseless or repugnant and which generate attempts to ignore or suppress them) and related compulsions (repetitive and seemingly purposeful stereotyped behavior designed to produce or prevent some future event or situation but not connected in a realistic way with what it is designed to produce or prevent or which is clearly excessive activity. The activity is performed with a sense of subjective compulsion coupled with a desire to at least initially resist the compulsion). Common obsessions are repetitive thoughts of violence (kill one's child), contamination (e.g., getting infection from shaking hands) and doubt (wondering whether one did something). The most common compulsions involve repetitive handwashing, counting, checking and touching. Depression is oftened associated with this disorder. *See, American Psychiatric Institute, Diagnostic and Statistical Manual for Mental Disorder* (DSM), 3d Ed. 1980, pages 234–235. The DSM differentiates Obsessive Compulsive Disorder from obsessive brooding, rumination or preoccupation (which involves excessive and repetitive thinking about real or potentially unpleasant circumstances, or indecisive consideration of alternatives) as not true obsessions because they lack the ego-dystonic quality of true obsessions and because the individual generally regards the ideation as meaningful although possibly excessive. The obsessive-compulsive disorder is not regarded by the DSM as a psychosis.

son's efforts to convince the appellant that his scheme was "crazy" and would not work. The appellant later told Captain Nelson that he made the trip having only one flat. [Captain Nelson thought this "crazy" because it was too risky to attempt, although he apparently had no direct knowledge of the condition of the car or, for that matter, whether the appellant ever made the trip.]

2. The commission of the instant offenses occurred when the appellant developed an obsession with getting out of debt. After weighing the perceived alternatives, the appellant decided to steal the checks, recognizing that it was wrong but justifying this behavior with the rationalization that he was borrowing the money briefly to get through an immediate crisis. Thus, the wrong became right and compulsion took over, resulting in the plan and then the execution of the offenses. [Captain Nelson believed this thinking and appellant's confessional estimate of the likelihood of his scheme's success were fantastic, irrational and illogical thinking, even though he was aware that the appellant had previously served at the Kansas City Finance Center and knew pay procedures, because an audit or "something" would lead to his discovery. On what practical basis or expertise Captain Nelson believed discovery was inevitable is not known. Captain Nelson also considered this behavior bizarre because it was out of character for a person whom he perceived as trying so hard to do everything right.]

3. When the I–I would do something, however trivial, regarding the appellant, the appellant often became "obsessed" with it, getting so upset that Captain Nelson encouraged the appellant to let himself be hospitalized. The appellant was hospitalized once in September of 1982.

4. The appellant had an "obsession" with knowing his natural father.

5. The various requests and letters written by the appellant were illogical and disjointed. [A conclusion difficult for a layman to perceive from an examination of the various documents.]

Mr. Klebel, the civilian psychologist, testified that the appellant was a very compulsive personality [2] experiencing an adjustment reaction to stress. As a compulsive personality, he has more limited ways of dealing with problems. If he cannot deal with the problem successfully, he becomes stressed. He has no control over the build up of stress related to unresolved problems and, in Mr. Klebel's opinion, the appellant was changing from a more realistic gregarious person to a more internalized person who was ruminating too much, also a matter over which the appellant had no control. According to Mr. Klebel, the appellant was not psychotic. Mr. Klebel considered the personality disorder to be a "mental disease or defect," affecting the appellant's mental and emotional responses to actual events. This "disease or defect" caused a lack of substantial capacity to conform to the requirements of the law. Stress was

---

**2.** A compulsive personality disorder involves a restricted ability to express warm and tender emotions; perfectionism that interferes with the ability to grasp "the big picture;" insistence that others submit to the person's way of doing things; excessive devotion to work and productivity to the exclusion of pleasure; and indecisiveness. These personalities are perceived as rigid and preoccupied with trivial details, allocate time poorly and often leave things undone until the last moment. Perfection and efficiency are idealized and seldom achieved. The authority of others is resisted while their own authority is insisted upon. Decisionmaking is postponed, avoided or protracted because of undue fear of error. Thinking about priorities usually results in assignments not being completed on time. Indecisiveness often causes stress. A depressed mood is common. When unable to control others, their situation or their environment, compulsive personalities constantly think about the situation and become angry, though not usually expressing anger directly. True obsessions and compulsions are not present in this disorder, though they can occur with it. See, DSM, page 326. It is noted that there exists significant distinctions between compulsion, obsession, stubborness and rumination as those terms are used in psychiatry and psychology, as evidenced by the DSM. The DSM, however, is only a guide and each psychiatrist or psychologist is free to use the terms in ways which facilitate their own understanding.

put upon the appellant by his desire to avoid being separated from the Marine Corps, and, after considering the alternatives he could perceive, he chose the course of taking the checks, knowing it was wrong, as being the only way out.

Dr. MacLeod, the civilian psychiatrist, diagnosed the appellant as experiencing adjustment disorder with mixed disturbance of emotion and conduct; compulsive personality, severe, dysthymic disorder;[3] and possible malfunction of the frontal lobe that might become active under stress causing instability (based on appellant's relation of three theretofor unmentioned blackout episodes and the Hawaii fainting episode). Like Captain Nelson and Mr. Klebel, Dr. MacLeod believed that a personality clash with the new I–I was the root of appellant's troubles. During this stressful time, the appellant, in Dr. MacLeod's opinion, experienced episodes of panic and fear of total annihilation at the thought of being discharged from the service to which he believed the appellant to be totally committed. The appellant told Dr. MacLeod that he even aimlessly followed the I–I around at night, confused and bewildered over what he (the appellant) might do to regain his position in the military. Dr. MacLeod described the appellant's personality as very brittle, being able to tolerate only so much stress before he would shatter like glass. The receipt of a letter of indebtedness, which appellant told Dr. MacLeod the I–I put in his record without telling the appellant, heightened his fear and panic. This event was piled on top of his relief from duties and the "unjustified" removal from his place of duty (explained as unjustified to Dr. MacLeod by Captain Nelson). [It should be noted that by this time the appellant had already "found" the checks and cashed at least one

of them.] When the appellant came to see him in April of 1983, Dr. MacLeod knew he was a compulsive personality by the frantic, preoccupied and obsessed way in which he presented matters to him. The appellant also appeared depressed. Dr. MacLeod believed that at the time of the offenses the appellant was experiencing a mental "disease or defect" in the form of compulsive personality disorder-severe, depressive neurosis and adjustment disorder. Dr. MacLeod noted that by the term "disease" he meant mental, not organic, disease. He characterized the appellant's conduct as due to a malfunction or nonexistence of mental rather than moral faculties or a defect of character caused by inadequate training or development. He felt the sanity board did not observe the appellant long enough. He also believed, like Captain Nelson, that appellant's signature of his own name to the last check was done because of a subconscious desire to rectify his unlawful behavior by being caught and knowledge that such a signature would have that result.

Captain K.A. Gaines, Navy psychiatrist, conducted the sanity board examination during which he interviewed the appellant for about three hours. Prior to conducting the board, Captain Gaines reviewed appellant's health record, service record, the charges and investigation, and the results of the examinations of the other psychiatrists. Captain Gaines used a unique interview method similar to the scientific key systems used to identify plants and rocks. The appellant brought a lot of documents and freely discussed his case with Captain Gaines. Captain Gaines believed that the appellant was not suffering from any mental disease or defect and could control his actions at the time of the offenses. Captain Gaines understood the word "crazy"

---

**3.** Dysthmic disorder (or depressive neurosis) is a mood or affective disorder often associated with a personality disorder and characterized as a chronic disturbance of mood involving depressed mood or loss of interest or pleasure in all, or most, usual activities, pastimes and associated symptoms such as disturbances of sleep, appetite and, weight; psychomotor agitation or retardation; decreased energy; feelings of sad-

ness, hopelessness, inadequacy, worthlessness and guilt; and difficulty in thinking. The distinction from major depression is a course of symptoms for two years duration and the severity of the depression and symptoms being significantly more mild and more chronic than is true of major depression. Depressive neurosis may be relatively persistent or intermittent and is known more for its chronicity than its severity.

as meaning psychotic or legally insane and did not interpret appellant's condition as "crazy," though he agreed that appellant was a compulsive personality based on the available information and his interview of the appellant. He also explained that the appellant did not take criticism well, and, when it was offered, became angry. The appellant tried hard to please but had mixed results. In conversations with Captain Nelson about the appellant, Captain Nelson did not use the words "obsessive compulsive" to describe the appellant's condition nor were the words used in appellant's health record. It is significant that Captain Gaines' evaluation was made at a time when the trial process was in gear, a process which had to produce the greatest of all perceived threats to appellant's career, financial and family circumstances; yet none of the panic, bizarre thinking or "crazy" behavior noted by the other psychiatrists was seen by him.

The Government also produced several witnesses from the command who related a number of problems the appellant was having with his unsatisfactory work and also testified about other activities such as dating, betting, sports participation, personal relations, and gambling in Las Vegas. All witnesses concluded that the appellant was normal and showed no signs of mental or behavioral abnormalities and gave no indication that he was cracking up during his tour at the I–I staff.

Introduced during the sentencing phase of trial was a stipulation of the expected testimony of Captain Nelson to the effect that the appellant was hospitalized at Long Beach on 6 September 1983 where Captain Nelson treated him and subsequently released him with a diagnosis of borderline personality.[4] Dr. Nelson did not explain his understanding of that term but said

that this meant that the appellant could cross the line from sanity to insanity at any time. He said that the appellant demonstrated regressed, psychotic behavior during the first three days of hospitalization, stared into space, revealed delusional material in his thought processes and was unable to maintain a minimal activity schedule. He also said that the appellant had a "psychological break" during the first day of trial during a recess.

Also, during the sentencing phase of trial, placed before the trial court was evidence that the appellant successfully completed a three credit-hour course in general psychology at Longview Community College in Kansas City, Missouri.

If the appellant is correct in arguing that the balance of the opinions of the experts is determined by a comparison of their respective credentials, as he indicates, and indeed, is suggested in *United States v. Bush*, 14 M.J. 900, 902 (NMCMR 1982), then the decision of this Court would have to be made in favor of the appellant. Truly, Captain Gaines was a single shore gun in a battle with a fleet of sixteen-inch credential guns. Credentials are, however, no guarantee of competence, judgment or insight. This battle of experts is not difficult to resolve if the horizon beyond the labels used by the experts is focused and true meaning is sought.

It is noted that Drs. Nelson, MacLeod and Kleber were the most captive to the appellant's version of the events which occurred in the 1980–1983 period. Much of Dr. MacLeod's outside information was derived from Captain Nelson. Captain Nelson evidently put a great deal of faith in the appellant's truthfulness and objectivity in spite of some suggestions in his testimony that he did not. Early on he was given

---

**4.** A borderline personality disorder is a disorder frequently associated with other personality disorders in which there is instability in a variety of areas, including interpersonal behavior, mood and self-image. Interpersonal relations are often unstable and intense; there is impulsive and unpredictable behavior; mood is often unstable with marked shifts from a normal mood to an anxious, uncomfortable mood; and inappropriate, intense anger or lack of control of anger may be present. There may also be uncertainty regarding self-image, gender identity or long-term goals or values. Often there is alteration between dependency and self-assertion. During periods of extreme stress transient psychotic symptoms of insufficient duration or severity to warrant an additional diagnosis may occur.

cause to regard with caution what the appellant told him when he learned from the I–I, and possibly others, that the I–I's assessment of appellant's activities and performance was correct. Instead of reading the signals, Captain Nelson then focused on the appellant's recitals as being the appellant's truthful perceptions (probably because the perceptions themselves were medically significant). Captain Nelson had little independent knowledge of anything the appellant related to him. It is significant that the appellant told Captain Nelson that he was "borrowing" the money by cashing the checks when his confession clearly implied the contrary intention. It may well be that some mental diagnoses can be made without externally derived information, but certainly the severity of a mental problem and the potential for manipulation of the psychiatrist are fact-dependent. It is also abundantly clear that the crazed illogical, obsessed, bizarre thinking individual Captain Nelson saw was not the same individual seen by the others on the I–I staff who worked closely with the appellant. There are several other practical problems with Captain Nelson's analysis.

He had an admitted broad concept of the terms "mental disease or defect" which incorporated personality disorders, rather than being limited to the more traditionally accepted concepts of psychosis or physiological malfunction.

Captain Nelson had an extremely loose concept of "craziness" which, based on the examples he gave, incorporated plans or solutions to which Captain Nelson attributed too much risk for his own comfort or which· he personally believed would not work no matter what the actual chances for success were. In the face of his patient's known expertise, Captain Nelson's characterization of the appellant's confession assessment of his own chances for success as a fantastic statement of illogical thinking is incredible.

Captain Nelson had little, if any, significant information about the offenses to which his various diagnoses were to relate.

Captain Nelson made value judgments about the relative correctness of the actions of the command and the appellant, some of which were passed on to Dr. MacLeod. These value judgments affected Dr. MacLeod's various diagnoses.

The foregoing, as well as the previously mentioned characterizations of Captain Nelson's approach including his constantly shifting diagnoses, suggest either that Captain Nelson is spring-loaded to use words which somewhat exaggerate the severity of a mental condition or that he was manipulated by the appellant or both. It is not necessary to the proper evaluation of Captain Nelson's otherwise valuable insights to decide which is the correct situation.

Like Captain Nelson, Dr. MacLeod had the same broad concept of "mental disease or defect" held by Captain Nelson. He also knew the appellant as an infinitely more frenzied and panic stricken individual than those with whom the appellant worked in the command. His view that the appellant was not responsible for anything done wrong in the course of his disorder is extremely broad. While Dr. MacLeod's explanation that the appellant was consciously or subconsciously trying to get caught when he signed the last check is possible, it is, as a practical matter, infinitely more likely that this was another one of those times when the appellant's inattention to detail rose up and bit him. Dr. MacLeod was also captive to the appellant's version of the relevant history of his condition and saw the appellant when the appellant knew he was facing trial on serious charges.

There is no significant difference of psychiatric opinion in this case. The appellant to some degree had a classic (DSM) compulsive personality disorder, a defect of character not a "mental disease or defect." Under severe stress he reacted in the typically compulsive way. But as Captain Nelson's lucid explanation of the appellant's thought processes (about which all experts fundamentally agreed) makes abundantly clear, the appellant knew right from wrong and could *choose* to do wrong. He was at no time *compelled* to do wrong, though

once he decided on a course of action he may have stubbornly stuck with it. There is no evidence to suggest that there is anything inherent in the compulsive personality which necessarily compels theft.

Captain Gaines' analysis is the most accurate expression of the appellant's mental status. He had a much broader perspective of the whole case than anyone else. He was not captive to the appellant's version of things. True, he did not rigidly follow the "book"[5] and he may not have gotten every scrap of personal history from the appellant nor have shotgunned every imaginable test, but he had all that any competent professional ever needs— enough information to draw correct conclusions.

▆▆▆▆ Since the Court of Military Appeals in *United States v. Frederick*, 3 M.J. 230 (C.M.A.1977), changed the military law on insanity, the test for mental responsibility has been the somewhat troublesome American Law Institute (ALI) test.[6] A person is not mentally responsible for crime if at the time of its commission there is a lack of substantial capacity either to appreciate the wrongfulness of the conduct or to conform conduct to the requirements of the law because of an existing mental defect or disease. *United States v. Frederick, supra.* Analysis begins with the determination of whether or not the appellant had an existing mental defect or disease; if so, whether relevant cognition was substantially effected and, if so, whether the capacity to conform to the law was substantially lacking. Mental disease or defect does not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct. Traditionally, legal insanity has not included defects in will power, character or personality traits, even when those traits are possessed to an abnormal degree. Paragraph 120, *Manual for Courts-Martial, 1969 (Rev.); United States v. George,* 6 M.J. 880 (ACMR 1979), *pet. denied,* 7 M.J. 65 (C.M.A.1979), and cases cited therein. Such disorders could, however, negate the specific intent required for a particular offense. *United States v. Dunnahoe,* 6 U.S.C.M.A. 745, 21 C.M.R. 67 (1956). The status of the distinction between personality disorders and legal insanity may no longer exist following the decision in *United States v. Frederick, supra,* even though the intention of the drafters of the ALI standard for legal insanity was to make the defense available to those accused suffering from the most severe of mental conditions,[7] consistent with the traditional pur-

---

5. NAVMED P–5015, *Psychiatry In Military Law* (1981). Captain Gaines was also habituated to destroying his case notes as a mechanism to avoid what he considered carping by trial lawyers. We do not attribute this practice to a prosecutorial bias, but rather the psychiatrist's frustration with the adversary process. No doubt he learned that when the law institutionalizes cross-examination so it's perceived as ridicule, embarrassment and other forms of second-guessing and sniping, his entry into the courtroom as the well-intentioned witness may permit him the attempt to seek refuge by destroying his notes but affords him no place to hide from the examination. The discomfort goes with the territory as a necessary protection for the individual accused.

6. Model Penal Code § 4.01, Proposed Official Draft (May 1962). *See,* Department of Justice, Attorney General's Task Force On Violent Crime, Final Report 54 (August 17, 1981), regarding modification to the insanity defense. *See also,* 5. 818, 127 Cong.Rec. § 2809 (March 26, 1981).

7. Weshler, *Codification of Criminal Law in the United States: The Model Penal Code,* 68 Columbia L.Rev. 1425, 1423 (1968). *See also, United States v. Brawner,* 471 F.2d 969, 1025 (D.C.Cir. 1972); *United States v. Cortes-Crespo,* 9 M.J. 717, 722 (ACMR 1980), *affirmed,* 13 M.J. 420 (C.M.A. 1982). There is precedent for retaining old concepts under newly adopted standards for mental responsibility. *See United States v. Brawner, supra; United States v. Chappell,* 19 U.S.C.M.A. 236, 41 C.M.R. 236 (1970). If, in fact, it is the intention of the Court of Military Appeals in *Frederick* to lift the intellectual horizons of the law to permit consideration of any form of abnormal mental condition, there should be a realization, born of trial experience in the Vietnam era, that there are psychiatrists who, without blinking an eye and with solemn face, are prepared to view even political and social beliefs as mental diseases or defects in the form of character disorders, which they are prepared to claim totally deprive an accused of the capacity to adhere to the right so as to render the accused legally insane even under the old more stringent irresistible impulse concept. We need only await the next war to see insanity, with its

pose of criminal law. Since the military judge gave the insanity instructions, we need not decide this precise issue, but leave it to the Court of Military Appeals and Congress. We need only apply the standard to the facts of this case.

■ Applying the *Frederick* standard in the light of the previously detailed evidence, we find beyond a reasonable doubt that at the time of the considered well-conceived and executed instant offenses the appellant was mentally responsible for his misconduct.

The only other issue meriting discussion is the appellant's assertion that the twelve counts of check theft are multiplicious for findings purposes with the twelve counts of forgery, citing a number of cases sired by *United States v. Baker*, 14 M.J. 361 (C.M.A.1983). It is evident from the pleadings that since *Baker* refocused and purified the military law regarding multiplicity some practitioners have lost sight of the traditional purposes and meaning of unreasonable multiplication of charges.

■ The facts of this case reveal that at most there were but three larcenies: the envelope of checks and the two checks taken after the first sergeant's audit. Giving the appellant the benefit of the doubt it is assumed that the latter two checks were taken at the same time. The envelope of checks was stolen at the time the appellant decided not to return or mail it but to appropriate the checks to his own use. Thus, there were two basic larcenies. At trial, the check theft specifications were all consolidated into a single specification on the document which published the offenses to the court members. No reason for such treatment is evident from the record of trial. It is apparent, however, that to allege a separate theft for each theft without regard to the fact that at least ten were stolen at the same time and place is a classic circumstance of unreasonable multiplication of charges, i.e. the pleading of a single offense in many charges, deliberate-

ly or incidentally causing an accused to look bad to the court members. The consolidation, albeit more inclusive than necessary, solved that problem. The charge sheet should have been conformed, at least after findings when all possible contingencies, if there were any, evaporated. The check offenses will be consolidated in the disposition of this case to conform to what actually occurred at trial. The case being in such a posture, the doctrine espoused in *United States v. Baker, supra*, and its progeny is inapplicable.

In view of the foregoing, Charge II and the specifications thereunder are consolidated as follows:

In that Staff Sergeant Harold H. Krauss, U.S. Marine Corps, _____ did at San Bernadino, California between 15 July 1982 and 15 September 1982 steal U.S. Treasury check # 19,496,993, of a value of about $131.40; U.S. Treasury check # 19,496,999 of a value of about $131.40; U.S. Treasury check # 19,547,841 of a value of about $70.75; U.S. Treasury check # 19,497,041 of a value of about $210.96; U.S. Treasury check # 19,496,-982 of a value of about $163.98; U.S. Treasury check # 19,496,997 of a value of about $192.57; U.S. Treasury check # 19,547,886 of a value of about $75.15; U.S. Treasury check # 19,547,872 of a value of about $97.47; U.S. Treasury check # 19,620,348 of a value of about $39.13; U.S. Treasury check # 19,642,147 of a value of about $291.04; U.S. Treasury check # 19,547,879 of a value of about $165.95; U.S. Treasury check # 19,497,052 of a value of about $131.40 for a total value of about $1701.20, property of the United States Government.

Specifications 2 through 12 of Charge II, except to the extent consolidated, are dismissed. The findings of guilty and the sentence are correct in law and fact and no error prejudicial to the substantial rights of the appellant was committed. Accordingly,

heavy administrative and medical overhead, rival multiplicity, with its paper chase, as the

most commonly litigated issue in military justice.

the findings of guilty and sentence, as approved on review below are affirmed.

Senior Judge GREGORY and Judge BARR concur.