**UNITED STATES**

v.

**Staff Sergeant Clyde Edward Lyman**
**MANSFIELD, FR 048–44–1263**
**United States Air Force.**

**ACM 24758 (f rev).**

U.S. Air Force Court of Military Review.

Sentence Adjudged 27 Nov. 1984.

24 April 1987.

**612**

Approved sentence: Dishonorable discharge, confinement for length of natural life, forfeiture of all pay and allowances and reduction to airman basic.

Appellate Counsel for the Appellant: Luther C. West, Baltimore, Maryland, Colonel Leo L. Sergi and Major Timothy J. Malloy.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni, Major David F. Barton and Captain Marc Van Nuys.

Before HODGSON, FORAY and MURDOCK, Appellate Military Judges.

### DECISION

HODGSON, Chief Judge:

The appellant was convicted of the premeditated murder of his paramour's former husband. He was sentenced to life imprisonment together with ancillary punishments.

The paramount issue before us goes to the heart of our adversarial process—the right to the effective assistance of counsel in presenting a defense. In this regard the appellant claims that his trial attorneys failed to investigate, prepare and present properly either an insanity or diminished capacity defense. We agree.

In the initial appellate pleadings this issue centered on the question of whether trial defense counsel committed the appellant to an insanity defense without weighing the consequences of such a defense, i.e., disclosure of damaging inculpatory statements by the appellant to his expert witness, and thereafter abandoning the defense midway through the trial because of the trial judge's order compelling production of these statements. *See United States v. Parker*, 15 M.J. 146 (C.M.A.1983). The defense, by its questioning of members during *voir dire*, cross-examination of prosecution witnesses, and pretrial declarations to the prosecution, made it clear that the appellant's mental condition was the core issue in the trial.

This claim of ineffective assistance of counsel is based on the representation made by the appellant's trial lawyers to the military judge that Doctor Michael B. Coburn would not be called as a witness because of the judge's order directing production of a statement made by the appellant at the direction of his counsel which was given to Doctor Coburn. Doctor Coburn was a defense psychiatrist who had travelled from the United States to Korea and was waiting outside the courtroom while this discussion took place. At trial, counsel asserted that the judge's ruling "[A]ffected the entire strategy of the defense" and their post-trial affidavits contended that "[T]he defense was precluded from presenting to the trier-of-fact expert opinion regarding the issue of the accused's mental responsibility, an affirmative defense."

On 3 January 1986, appellate government counsel responded to this issue with a reply brief and supporting affidavits from the defense counsel involved. Subsequently, the appellant moved to file a supplemental brief contending that the post-trial statements of trial defense counsel expanded the issue of ineffective assistance of counsel by raising additional questions of: (1) Whether defense counsel acted improperly and contrary to their obligation to the appellant and the court by instructing him to withhold material information from Doctor Coburn, a defense psychiatrist, and (2) Whether this conduct so prejudiced the ap-

pellant that he was denied effective assistance of counsel and therefore a fair trial.

On 11 February, government and appellate defense counsel jointly and severally asked for a limited evidentiary hearing because the trial transcript, pleadings and supporting affidavits suggested there were substantial and unresolved questions involving the appellant's lack of mental responsibility and claim of ineffective assistance of counsel. We ordered such a hearing and it was held on 6–8 May 1986. *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). The trial judge who conducted the hearing prepared and submitted extensive findings of fact which have made our task measurably easier.

## I

The trial and evidentiary hearing transcripts disclose that the appellant was apprehended at Edwards Air Force Base, California on 5 April 1984, for the murder of Yang Chae-Song, near Osan Air Base, Korea, on 4 February 1984. It was at Edwards, during a pretrial confinement hearing, that the appellant entered into an attorney-client relationship with Captain P, the Area Defense Counsel. Captain P became one of four military lawyers who assisted in the appellant's defense. The other three were the Chief Circuit Defense Counsel for the 7th Circuit, Lieutenant Colonel N, Circuit Defense Counsel, Major P, and the Area Defense Counsel at Osan Air Base, Major, then Captain, H. It was during the confinement hearing that Captain P became aware of the appellant's "bizarre behavior" and "obsession" with Un-Cha Haney who was the Korean wife of an Air Force member, the former wife of the deceased, and the appellant's lover. Captain P did not, however, pass this information, or his assessment of it to his co-counsel.

After the appellant was returned to Korea on 20 April, he was sent to Yokota Air Base, Japan for a sanity board hearing. He refused to participate in the proceeding on advice of counsel as his attorneys did not yet know enough about the case. La-

ter, in June, Lieutenant Colonel N and Major H requested a sanity board citing the appellant's "preoccupations and obsessions," his behavior described by numerous individuals as "crazy and bizarre," and his referral to the Mental Health Clinic at Edwards by his unit commander in early January 1984. On 21, 22 and 25 June, he met a one member sanity board consisting of Lieutenant Colonel (Doctor) Robert L. Vosburg. Doctor Vosburg was of the opinion that the appellant had a mental disorder described as a post traumatic neurosis, chronic. *See American Psychiatric Institute, Diagnostic and Statistical Manual for Mental Disorders (DSM),* 3d Ed.1980, page 326. In Doctor Vosburg's view the appellant had a diminished capacity to appreciate the criminality of the alleged offense and lacked the capacity to conform his conduct to the law as a result of the mental disorder. The appellant's attorneys were both "somewhat surprised" and "elated" with the outcome of the sanity board, and it was at this time the defense team first considered insanity to be a viable defense. However, Major H was concerned that Doctor Vosburg lacked experience and might not be a "strong witness." Despite this doubt, he did not discuss the insanity defense with Doctor Vosburg because Major P was responsible for preparing this aspect of the trial.

The "team concept" employed by the appellant's attorneys is troublesome because no lawyer served as "lead counsel". Therefore no one was totally familiar with the overall posture of the case and no one could be the final arbiter on tactics and strategy. It is also apparent that after it was decided to focus the defense efforts on the sanity issue, Lieutenant Colonel N became less active in the ongoing trial preparations, although both Majors P and H regularly consulted him by phone.

At this point the appellant's counsel felt they needed additional expert testimony to bolster Doctor Vosburg's opinion. Knowing that the appellant would be returned to Edwards for a portion of the pretrial investigation, they arranged for Captain P to

locate civilian psychiatrists in the local area. Captain P set up appointments with Doctors Michael B. Coburn, John Beck, and William T. Vicary. Although Captain P and the appellant still had an attorney-client relationship, he never discussed the results of these evaluations with the examining psychiatrists or with the other defense counsel. It is evident that Captain P's involvement with the case substantially diminished after Majors P and H were appointed and that he did not regard himself as an active member of the defense team. There is also a suggestion that the appellant was dissatisfied with Majors P and H, and wanted Captain P to represent him. Captain P did not encourage the appellant in this regard, and explained the advantages of having lawyers who were near the trial location.

Later, Captain P did have some contact with Doctor Coburn over the logistics of the latter's trip to Korea as an expert witness. He did not, however, discuss with Doctor Coburn his opinions as to the appellant's mental state.

Subsequent to the psychiatric evaluations, Captain P realized that Doctor Vicary could support a defense of partial mental responsibility, but made no attempt to discuss his conclusions with the psychiatrist or to pass this information to his co-counsel.

On 16 August, Doctor Beck sent Captain P a written evaluation of his examination of the appellant. Doctor Beck concluded that at the time of the alleged offense the appellant had a mental defect, i.e., a Mixed Personality Disorder and as a result of such mental defect he lacked capacity to conform his conduct to the requirements of law. At the time of the evidentiary hearing, Captain P did not recall the letter's contents and surmised he had forwarded it to Majors P and H who received it before trial. Neither Major P nor Major H considered Doctor Beck's diagnosis to support an insanity defense. *But see United v. Benedict,* 20 M.J. 939 (A.F.C.M.R.1985) holding that the term "mental defect" includes any abnormal condition of the mind,

regardless of its medical label, that substantially affects mental or emotional processes and substantially impairs behavior controls.

Finally, in September, Doctor Coburn called Captain P to advise him that he had changed his initial opinion and he could now support an insanity defense. Doctor Coburn sent Captain P a written evaluation, and the latter forwarded it to co-counsel in Korea.

Both Majors P and H were present during the pretrial investigation held at Edwards on 26 July. Major H did not contact the three civilian psychiatrists while he was in California because he regarded Major P to be the "defense team member" responsible for the insanity defense.

Likewise, Major P, the attorney responsible for presenting the insanity defense, did not interview the civilian psychiatrists while he was at Edwards. Apparently, he was led to believe that all three doctors found that the appellant had a personality disorder and that their expert testimony would not support an insanity defense. It was also his understanding that an insanity defense could not be based on a personality disorder. As stated earlier this position is not supported by case law. *See United v. Benedict,* supra; *United States v. Krauss,* 20 M.J. 741 (N.M.C.M.R.1985); *United States v. Haywood,* 18 M.J. 562 (A.C.M.R. 1985).

During the pretrial investigation both attorneys learned of approximately 37 lay witnesses who felt the appellant was "strange" or "crazy." In a 29 October 1984 letter, they asked government counsel to provide the names and addresses of these witnesses. Other than this request, there is no indication that this lay witness evidence was explored, evaluated or marshalled to contribute to an insanity defense in any meaningful way.

After Doctor Coburn concluded he could support an insanity defense, Major P contacted him by telephone from Japan. He did not, however, discuss Coburn's testimony with him until the latter's arrival in Korea. It was at this time that Major P

first provided Doctor Coburn with the definition of insanity that would be applied in a military court-martial. See Air Force Regulation 160–42, *Psychiatry in Military Law*, 25 September 1981. Major P was aware of Doctor Beck's evaluation, but never discussed it with him because of Major P's assumption that it would not support an insanity defense. Likewise, he never discussed Doctor Vicary's opinion with Vicary although it could have supported the potential defense of partial mental responsibility. Neither Major P nor his co-counsel ever pursued this potential defense notwithstanding the opinions of every defense psychiatrist who examined the appellant that he had an emotional disorder.

■ The law is clear that a mental condition not amounting to a general lack of mental responsibility but which produces at the time of the offense a lack of mental ability to entertain a *premeditated design to kill* is a defense to an offense having this state of mind as an element. R.C.M. 916(k)(2); *see also United States v. Erb*, 30 C.M.R. 938 (A.F.B.R.1960), *aff'd* 12 U.S.C. M.A. 524, 31 C.M.R. 110 (1961).

In early September 1984, the trial judge ordered the appellant to submit to a second sanity board to be convened at Travis Air Force Base, California. This board, consisting of three psychiatrists, opined that the appellant did not have a mental disease or defect. No effort was made by either Major P or Major H to have Captain P, who was stationed in California, interview the members of the second sanity board; nor did Major P interview the board president until after his arrival in Korea as a government witness just before the beginning of or early in the trial.

After Major H met the appellant in late April 1984, he obtained from him an oral version of the circumstances surrounding the commission of the offense which he later reduced to writing. This statement suggested a high degree of culpability on the appellant's part. Because Major H concluded that the appellant was not completely forthcoming with the facts, he edited the first written statement into a second written statement. Since the appellant later recanted much of the inculpatory information in the first statement, indicating that some of the story was false, embellished, or dreamed, Major H edited the first statement to include only information that was, to some degree, verifiable. The appellant's first version indicated he had hired a "hit man," a Korean national, to kill the victim. The second written statement became the factual scenario the appellant was instructed by his lawyers to give during psychiatric interviews. This version omitted information relating to the possible procurement of a "hit man," purchase of a knife shortly before the homicide and the manner of its use at the scene.

Both Doctor Vosburg and Doctor Coburn eventually learned of the "hit man" aspect of the appellant's story and both indicated it did not substantially effect their diagnoses of his mental condition.

When Doctor Vosburg arrived in Korea he was interviewed at length by the appellant's co-counsel. Although Vosburg basically agreed with Coburn as to the appellant's mental state, both counsel still considered him a weak witness because he was "nervous" about testifying since he was not a forensic psychiatrist.

Doctor Coburn arrived in Korea approximately the same day the prosecution rested its case-in-chief. He was prepared to testify that at the time of the offense the appellant was *"substantially lacking the capacity to have conformed his conduct to the requirements of law [that] substantially diminish[ed] his capacity to have appreciated the criminality of his conduct ..."* He would further state that the appellant *"was acting in a significantly and substantially impaired state at the time of the offense, substantially lacking in capacities required for legal sanity, and requires continuing treatment because suicidal potential."* (Emphasis added).

The decision to abandon the insanity defense was made after Doctor Coburn's arrival in Korea and the discovery of the "hit man" information in his notes. Appellant's

counsel believed disclosure of this information would have had a devastating impact and would have created a substantial risk of their client's conviction of premeditated murder. Additionally, they were convinced that the value of Coburn's testimony was lessened as counsel were not prepared to deal with the "hit man" factor of his testimony. Of course, the reason Doctor Coburn was not aware of this information earlier was that the defense team had withheld it. In the evidentiary hearing, Doctor Coburn stated that the "hit man" disclosure had not changed his opinion regarding the appellant's lack of mental responsibility and could have been accommodated in his explanation of psychodynamics of the events leading up to the homicide.

Appellant's counsel stated during the evidentiary hearing that they were aware from the outset that if they presented expert testimony of a psychiatrist as to the appellant's mental condition, they would be required to produce materials and statements by the appellant, which had been used by their witness for use during cross-examination. *See United States v. Parker, supra.* They contended that their claim in the *Goode* response that the trial judge's ruling was erroneous and caused the collapse of the insanity defense was merely a *pro forma* assertion of error without any belief in its validity. *United States v. Goode,* 1 M.J. 3 (C.M.A.1975).

Appellant's counsel maintained they had proceeded from the beginning with a two-pronged strategy: first, to put the prosecution to its proof to establish beyond a reasonable doubt that the appellant had killed the victim; and, second, to demonstrate the appellant's lack of mental responsibility for commission of the offense. For reasons discussed earlier, the decision was made not to present any evidence, including evidence touching on the appellant's lack of mental responsibility. The Chief Circuit Defense Counsel, Lieutenant Colonel N, discussed the situation with co-counsel, and even though he thought there was an "overwhelming danger" in abandoning the insanity defense at that point in the trial, he chose not to "override" their decision.

When trial defense counsel consulted Captain P, he told them he thought the decision a "dangerous" course of action.

## II

The Sixth Amendment and the Uniform Code of Military Justice guarantee a criminal defendant reasonably effective assistance of counsel. Article 27(a), U.C.M.J., 10 U.S.C. § 827(a); *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980); *United States v. Jefferson,* 13 M.J. 1 (C.M.A.1982). But this right does not mean that appellate courts should vacate a conviction on a claim of ineffective assistance of counsel in the absence of a display of a serious lack of skills that are regularly found in the performance of fallible lawyers. *United States v. DiCupe,* 21 M.J. 440 (C.M.A. 1986); *see also United States v. DeCoster,* 624 F.2d 196 (D.C.Cir.1979). Because claims of inadequate representation are ofttimes made by disaffected clients seeking to assign the blame for their predicament to their lawyers rather than themselves, the law presumes that counsel is effective, and places upon an appellant the burden of establishing ineffectiveness. *Commonwealth v. Molina,* 358 Pa.Super. 28, 516 A.2d 752 (1986).

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set out a two part test to determine whether a conviction should be set aside on the ground that the trial defense counsel was ineffective: (1) the appellant must show that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. To satisfy the first prong of the test, the appellant must show that counsel's actions fell beneath an objective standard of reasonable professional assistance. The second prong is satisfied by showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confi-

dence in the outcome of the trial. An insufficient showing of prejudice leads to a rejection of the claim without inquiry into the adequacy of counsel's performance. Of course, the mere fact that conviction has resulted does not meet the criteria of prejudice. *See Bates v. Blackburn*, 805 F.2d 569 (5th Cir.1986).

The standards of what constitutes ineffective assistance of counsel utilized by most of the federal courts have been adopted by the military appellate courts. *United States v. Jefferson*, supra. In *United States v. Rivas*, 3 M.J. 282, 288 (C.M.A.1977), the Court of Military Appeals stated:

> We believe that to exercise the skill and knowledge which normally prevails within the range of competence demanded of attorneys in criminal cases requires that the attorney act as a diligent and conscientious advocate on behalf of his client.

■ Disagreements as to the strategic or tactical decisions made at the trial level by defense counsel will not support a claim of ineffective assistance of counsel so long as the challenged conduct has some *reasoned* basis. Appellate courts will not review the wisdom of a defense counsel's tactic unless it lacks a *plausible* basis. *United States v. Rivas*, supra; *United States v. Rogan*, 19 M.J. 646 (A.F.C.M.R. 1984); see also *State v. Stone*, 151 Ariz. 455, 728 P.2d 674 (1986); *Bass v. State*, 713 S.W.2d 782 (Tex.App.1986). Any claim of inadequate representation is to be determined by the facts of that particular trial and the existing circumstances under which counsel's decisions were made. See generally *Makenson v. State*, 719 S.W.2d 112 (Mo.App.1986).

The basic claim of error made by appellant's appellate counsel is that the defense lawyers in the trial below failed to investigate, prepare and present evidence which would properly support the defense of insanity or diminished capacity so as to reduce the degree of guilt.

■ The right to reasonably competent counsel includes a correlative duty on defense counsel to undertake reasonable steps to investigate all open avenues of defense. *Wood v. Zahradnick*, 578 F.2d 980 (4th Cir.1978). We think a reasonable level of competence to be demanded of attorneys in criminal cases is to investigate facts known to, or with diligence accessible to them, which would raise a reasonable doubt as their client's mental condition. *Osborne v. Commonwealth*, 378 Mass. 104, 389 N.E.2d 981 (1979).

■ We have no doubt that defense counsel in the trial before us honestly and sincerely attempted to insure that the appellant was provided every possible defense. Much of what they did during the trial and before demonstrates diligent and conscientious endeavors on their part to represent their client properly. Unfortunately, their collective efforts with regard to the defense of insanity did not rise to the level of representation than the law requires.

From the outset it appears that no one counsel was given overall responsibility of orchestrating the defense efforts. Responsibility was divided so that everyone was in charge and yet no one was in charge. For example, the Chief Circuit Defense Counsel thought the decision to abandon the insanity defense was "overwhelmingly dangerous" at that point in the proceedings, yet did not use his position as the professional supervisor of defense counsel to intercede. See Air Force Manual 111–1, *Military justice Guide*, 1 August 1984, para. 13–3e. Although, Captain P was the first counsel to enter into an attorney-client relationship with the appellant, he did not consider himself part of the "defense team" and limited his participation to providing logistical support for appointments with the psychiatrists. After Majors P and H arrived at Edwards for the pretrial investigation, neither they nor Captain P ever spoke with the three civilian psychiatrists as to the results of their interviews with the appellant. It was through casual conversations with legal office personnel that Major P "heard" that all three doctors concluded that the appellant had a personality disor-

der. Additionally, both Majors P and H appeared to be unaware that a personality disorder can be the basis of an insanity defense or can be used to lessen the degree of culpability of the offense charged, i.e., premeditated to unpremeditated murder. *See* R.C.M. 916(k)(2); *United States v. Benedict, supra; United States v. Krauss, supra; United States v. Heywood, supra.* Further, none of the attorneys interviewed or evaluated the numerous lay witnesses who thought the appellate was "strange" or "crazy." In this regard Captain P was stationed at the same base as these witnesses.

Although defense counsel asserted during the evidentiary hearing that the insanity defense was but one defense theory, the other being to put the government to its proof on the evidence proper, the thrust of *voir dire,* challenges, preliminary instructions by the trial judge, and questioning of prosecution witnesses clearly made insanity the core of the appellant's defense. In this context, to uphold the decision to abandon this defense after the prosecution rested would require an explanation that is reasoned and plausible. Such an interpretation is not possible in this case.

Doctor Coburn, a forensic psychiatrist with impressive credentials, appears to be the key to the appellant's insanity defense. He had examined over 800 defendants in homicide cases as well as thousands of other offenders. He was prepared to testify that the appellant was legally insane. The basis for foregoing Coburn's testimony was the knowledge that the prosecution knew about the "hit man" aspect of the appellant's prepared statement, and this disclosure was "devastating" to both the defense theories, i.e., reasonable doubt and insanity. During oral argument appellate government counsel suggested that the available prosecution rebuttal evidence as to the appellant's mental state was so compelling that the failure of appellant's counsel to offer evidence on this issue was not prejudicial. We reject this premise. If there is one area where expert witnesses are almost always diametrically opposed, it is the field of psychiatry. *See United*

*State v. Neely,* 21 M.J. 606 (A.F.C.M.R. 1986); *United States v. Benedict, supra.* Doctor Coburn stated at the evidentiary hearing that the introduction of the "hit man" theory did not alter his diagnosis.

We wish to make clear that we are not holding that a defense counsel *must* always offer evidence in his client's behalf. We know full well that many times the *best* trial tactic is to put the prosecution to its proof. Likewise, we also know that defense theories *can and must* be changed during a trial to fit changing conditions, and where there is a *reasoned plausible* basis for the decisions and tactics of counsel, we will not upset a conviction on a claim of inadequate representation.

However, the trial and evidentiary hearing transcripts in the case at hand force us to conclude there was a fatal breakdown in the adversarial process that our system counts on to produce just results. *Ewing v. Williams,* 596 F.2d 391 (9th Cir.1979). Accordingly, this conviction cannot stand. In our decretal paragraph we will fashion a remedy.

### III

The appellant asks that the charges be dismissed since a total of 210 calendar days had elapsed from the day he was placed in pretrial confinement to date of trial. R.C.M. 707. In denying the motion to dismiss, the trial judge found that only 85 days of the total was accountable to the government. R.C.M. 707(c). We have examined the judge's findings of fact, the appropriate case law and the transcript. We find no basis to overturn his ruling denying the motion to dismiss.

### IV

The findings of guilty and the sentence are set aside. A rehearing may be ordered.

Senior Judge FORAY and Judge MURDOCK concur.