728 P.2d 674

**STATE of Arizona, Respondent,**

v.

**Edward Perry STONE, Petitioner.**

**No. 1 CA–CR 9717–PR.**

Court of Appeals of Arizona,
Division 1, Department C.

July 15, 1986.

Thomas E. Collins, Maricopa Co. Atty. by H. Allen Gerhardt, Deputy Co. Atty., Phoenix, for respondent.

Myrna J. Parker, Phoenix, for petitioner.

PAUL G. ULRICH, Judge Pro Tem.

Petitioner was found guilty of criminal trespass and aggravated assault, both class six, non-dangerous felonies, and was placed on three years probation on July 12, 1984. He filed a direct appeal (*State v. Stone*, 1 CA–CR 8146, aff'd, Jun. 27, 1985). In this petition for post-conviction relief, petitioner argues that interjection of references to religion at trial violated his due process right to a fair trial and constituted fundamental error. The petition for relief was denied by the trial court. Petitioner argues the trial court erred in summarily dismissing his petition because his attorney's conduct was ineffective when he allowed the issue of religion to be improperly injected into his trial. We disagree. We find petitioner has failed to present an issue of law or fact which would entitle him to relief and conclude the trial judge did not err in denying his petition.

A brief factual statement is necessary to place the religion issue in proper context. On October 2, 1983 at approximately 3:50 a.m. a male intruder entered the female victim's home. The victim, who was asleep, awoke to find the intruder lying in bed next to her. The victim uses corrective contact lenses to see clearly, and was not wearing them at that time. Upon seeing the intruder, she began to scream. The intruder placed his hand over her mouth and a thumb on her throat to keep her from screaming. After she promised not to scream, the intruder released her and put a pillow over her face. The intruder then pulled his pants on and reached for his glasses on the top of the bed. Although she could not see the intruder's full face at this time, the victim saw his right profile. She testified the intruder was wearing LDS endowment garments used by those who practice the Mormon faith. The intruder then departed. The state presented evidence establishing petitioner's truck was parked at the victim's apartment complex near the time of the crime, he had been acquainted with the victim for approximately four and one-half years and had been her next-door neighbor, he had access to the victim's house keys, the victim called petitioner's house shortly after the intruder left to confirm petitioner was not there, and the victim positively identified the petitioner as the intruder while he was in bed with her. One of the issues at trial concerned the identification of the petitioner as the intruder on the morning in question.

The references to religion now challenged by petitioner were made by both the prosecutor and defense counsel. The prosecutor's references were made during his opening statement, direct examination of the victim and closing argument.

In opening statement, the prosecutor stated:

In ... [the victim's] moment of fright and fear and perhaps even hysteria, recognizing who the assailant was, she called his home. Now, keep in mind this is 3:50 in the morning. A few minutes have passed so the time is now 3:53, 3:54, something like this.

*As a Mormon lady and a religious person she is having trouble with this incident.* She in some ways is not believing it because she knows the person; she knows he's a member of the church, a friend of hers and her husband's, so she's having conflicts over what to do. So she calls his home and in some way she's hoping that he's at home, but the wife answers, the wife named Brenda Stone. She asks if Edward Perry Stone

is home, and Brenda said, 'No, he's not. He's delivering newspapers.'

On direct examination of the victim, the prosecutor elicited testimony concerning the night before the incident. Apparently, the victim's family and defendant's family watched a movie together at the victim's home. The victim was asked:

Q. Anything unusual with the way ... [the defendant] was attired that night?

A. He had on his pants and no shirt, but he wears a certain type of underwear so he had on just the underwear.

Q. Would that be what we call the endowment garment?

A. Yes.

Q. He was wearing the top of the endowment garment—

A. Yes.

Q. —without an outer shirt?

A. Yes.

Q. Is that unusual in the Mormon way of wearing those garments?

A. Yes, with company in your home.

Q. *How is that garment supposed to be treated in your—*

A. *As sacred, as your own skin. You don't show other people.*

During closing argument, the prosecutor argued:

We know that the victim in her hysteria called the home of the defendant, Edward Perry Stone. She wanted to know if he was there, because in her mind—and *I think you can understand that we have a deeply religious woman*, herself through the temple rights wearing the endowment garments involved in this incident with a man who's a member of her church also wearing endowment garments, husband of one of her best friends—she is having trouble believing this happened. Her mind is not accepting that he would do such a thing, yet she knows it happened.

So she calls over there and she says, 'Is Perry there?' And, of course, he's not there, and, of course, the wife testified, and you have to understand her

situation. Most of you people are probably married. If you put yourself in her position, how would you feel about it at that moment and in the months that have gone by? Is it true that my husband was in bed with my best friend? Is it true that he was over there? I mean, what would that do to most marriages if a wife were to believe it? I mean, it would tear it to pieces. Trust, commitment, let alone criminality; families get involved the church gets involved. It's very heavy for a wife to deal with this.

■ In *State v. Gerlaugh*, 144 Ariz. 449, 698 P.2d 694 (1985), our supreme court declared that the standard of effective assistance of counsel for cases pending on appeal as of January 9, 1985, is governed by *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1984), *cert. denied*, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985). *Nash* sets forth a two prong test for judging ineffective assistance of counsel: (1) whether counsel's performance was reasonable under prevailing professional norms and (2) a reasonable probability that but for counsel's alleged unprofessional errors the result of the proceeding would have been different.

The prosecutor in response to the petition for post-conviction relief here involved stipulated the first required prong of the *Nash* test had been met, *i.e.*, that counsel's performance was not reasonable under prevailing professional norms. In our opinion, the prosecutor's religious references may have been inappropriate because they related to the victim's or defendant's credibility, rather than solely to her identification of petitioner as the intruder. *See* Rule 610, Arizona Rules of Evidence, Art. II § 12, Arizona Constitution. However, assuming, without deciding, the references were improper and the first prong of the *Nash* test for ineffective assistance of counsel was satisfied by defense counsel's failure to object to them, we conclude nevertheless the second prong was not.

■ Arizona Constitution, Art. 2 § 12 and Rule 610, Arizona Rules of Evidence provide in part:

Art. 2 § 12: [Nor] shall any person be ... questioned touching religious belief in any court of justice to affect the weight of his testimony.

Rule 610: Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced.

Admission of religious information may in certain circumstances constitute fundamental error. *State v. Thomas*, 130 Ariz. 432, 636 P.2d 1214 (1981). However, if such information is probative of something other than veracity, it is not inadmissible simply because it may also involve a religious subject as well. *State v. Crum*, 150 Ariz. 244, 722 P.2d 971 (Ariz.App.1986). A review of the portions of the trial transcript previously referred to leads us to conclude *State v. Crum* is applicable and *State v. Thomas* is distinguishable.

In *Thomas* the defendant was convicted of sexual abuse and sexual conduct with a minor. The victim, a fourteen-year old female, could not recall what had happened to her during the commission of the crimes after the defendant unzipped his pants. Once she regained consciousness from a "mental block," she observed the defendant zipping up his pants and felt a wet substance on her legs she believed was semen. The defendant argued on appeal that fundamental error occurred when the prosecutor during trial made references to the victim as a "very religious" girl who should be believed rather than the defendant. The court noted:

Fundamental error has been variously defined by this court as 'such error as goes to the foundation of the case or takes from the defendant a right essential to his defense,' *State v. Gamble*, 111 Ariz. 25, 26, 523 P.2d 53, 54 (1974) and as 'error of such dimensions that it cannot be said it is impossible for a defendant to have had a fair trial.' *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977). Before a finding of fundamental error can be made, it must be apparent that error was committed by the trial court in some aspect of the proceedings.

If it is determined that error occurred, the prejudicial nature of the unobjected-to error must be evaluated in light of the entire record. *State v. Pulliam*, 87 Ariz. 216, 349 P.2d 781 (1966), *rev. on other grounds, State v. Cobb*, 115 Ariz. 484, 566 P.2d 285 (1977). If there is substantial evidence in the record to support the verdict and it can be said that the error did not, beyond a reasonable doubt, contribute significantly to the verdict, reversal is not required. If, however, it appears that the error did contribute to or significantly affect the verdict, fundamental error was committed and reversal is mandated on due process grounds, *i.e.*, "it cannot be said it is possible for a defendant to have had a fair trial." *State v. Smith, supra.*

130 Ariz. at 436, 636 P.2d 1214. After reviewing the entire record, the court in *Thomas* concluded the credibility of the victim as a witness was a "crucial, determinative factor" in the case and that her testimony "stood alone as evidence establishing the appellant's guilt." 130 Ariz. at 436, 636 P.2d 1214. In *Thomas,* the sole purpose of the references to religion were to enhance the victim's credibility.

■ A fair reading of the references to religion made by the prosecutor in this case confirms they relate somewhat to the credibility of both the victim and the petitioner. It is possible the victim's identification testimony may have been somewhat enhanced by the prosecutor's opening and closing arguments. Those arguments explained why she did not tell petitioner's wife over the telephone that petitioner had been there. They also suggest she was under a great deal of stress when she called the Stone residence. Testimony elicited on the victim's direct examination might also be interpreted as an attack on petitioner's credibility because it suggests he disregarded how "sacred" the garments are to be treated. However, the prosecutor made no attempt to obtain testimony from the victim seeking to enhance her credibility because of her religious beliefs, as was done in *Thomas*.

After carefully reviewing the record as a whole, we conclude the statements and the examination referred to by the prosecutor are merely isolated references and not significant in relation to the trial proceedings in their entirety. We find the arguments and testimony might equally be viewed as identification evidence tending to establish the victim's knowledge of what the LDS garments look like and that petitioner wore such garments. Thus, here the references were related at least in part to identification and *not* solely to the victim's credibility as in *Thomas.*

Furthermore, the victim's credibility in *Thomas* was a "crucial, determinative factor" in that case. In the instant case, the victim's credibility was important, but we cannot say it was determinative. In addition to her identification of the petitioner as wearing the garments during the commission of the offense, the state presented evidence showing petitioner's truck was parked at the victim's complex near the time of the crime, he had access to the keys to the victim's house, the victim's call to petitioner's home confirmed he was not there, and finally the victim positively identified the petitioner as the intruder while he was in bed with her. Since the religious references were probative not only to witness credibility but also were probative of identification, and because the victim's credibility was not determinative in establishing his guilt, *Thomas* does not require us to reverse. Contrary to the result in *Thomas,* we find substantial other evidence in the record to support the verdict and, beyond a reasonable doubt, that any error did not contribute significantly to the verdict.

In *State v. Crum,* appellant was tried and convicted of multiple counts of child molestation. On appeal he complained, *inter alia,* that the prosecutor improperly introduced religious issues into the trial by referring to him as "Father Tim" and by asking witnesses about a chapel in his house and their services as altar boys. The court found the "Father Tim" references were proper because it was "simply a means of identifying appellant and had

nothing to do with his credibility." *State v. Crum,* 150 Ariz. at 246, 722 P.2d at 973. The jury on voir dire was questioned about it, the prosecutor and defense counsel used the title and appellant himself used the title when he identified himself to the police. With regard to the questions about the in-home chapel and the use of altar boys, the court said these references "served a legitimate purpose quite apart from witness veracity" at 246, 722 P.2d at 973. The court found the references were used to establish appellant's modus operandi when he seduced the children.

The issue of religion would have inevitably been injected into this trial by the state due to the victim's identification of a long-time family acquaintance as the person who assaulted her. References to the victim's religious beliefs were made to explain her apparent initial reluctance to identify petitioner as the intruder to the petitioner's wife. The victim's identification of the petitioner was based upon his wearing of the LDS church garment. The foundation for the victim's knowledge regarding that garment and her knowledge of the petitioner wearing such garment thus related to his identification, rather than solely to his credibility. Although we cannot say the references were totally free from impropriety, they are insufficient to constitute fundamental error because they also served a legitimate purpose and were not determinative of the outcome in this case.

The trial court's decision is entitled to significant deference because the judge was present at trial and can better evaluate the cogency of the evidence and assess the relationship between counsel's allegedly defective performance and the verdict. *State v. Gerlaugh, supra.* Under the facts in this case, we conclude the trial court did not err in determining that under the second prong of *Nash* the verdict would not have been different had any impermissible religious references not been made.

The remaining references to religion complained of were made by appellant's trial counsel during cross-examination of

the victim regarding the circumstances surrounding the morning of the incident:

Q. All right. And you were absolutely certain in your mind at that point that it was Perry Stone?

A. Yes.

Q. Would you categorize for me—did you go to church together?

A. Sometimes. Not ever in the same car. Is that what you mean?

Q. No, but at the same—

A. In the same time?

Q. Same meeting, yes.

A. Yes.

Q. *Were you a frequent churchgoer?*

A. *Yes.*

Q. *Would you categorize Perry as a frequent churchgoer?*

A. *No.*

Q. Was he an occasional churchgoer?

A. Occasional.

Q. And you're aware that Perry at some point in time had received his endowment garment?

A. Yes.

Q. How did you come about that knowledge?

A. Being friends with them I knew he had served an LDS mission, which you have to go through the temple before you can do that. He did that before he got married. I knew they had been married in the temple, which requires going through an endowment session.

Q. *So you have to be a pretty good Mormon to achieve that level in the church?*

A. *Yes.*

Q. So your opinion that he wasn't a good Mormon is based—

A. Yes.

Q. —primarily on the fact he doesn't go every Sunday or—

A. Would you ask that again?

Q. You told me he wasn't a very good Mormon.

A. No, I didn't tell you that.

Q. All right.

A. I told you he didn't go very often to church.

Q. Now, these endowment garments, they have some kind of almost sacred significance, don't they?

A. Correct.

Q. And they're very distincitive [sic]?

A. Correct.

Q. They have little hieroglyphics on them?

A. Yes.

Q. They're like sacred symbols, right?

A. Correct.

Q. And when you're wearing these kind of garments are you supposed to commit crimes?

A. I beg your pardon?

Q. *Are you supposed to commit crimes when you're wearing these garments?*

A. *No.*

Q. *That would be a sacrilegious sin, wouldn't it?*

A. *Very much so.*

Q. These garments, they come off just like normal T-shirts; they're not—

A. No.

Q. They do come off, right?

A. Yes.

Q. You can wash them?

A. (No oral response.)

Q. Yet you're telling me that Perry Stone, in his endowment garments, was in your apartment and in bed with you on October 2, 1983?

A. That's what I'm saying.

■ Despite the state's stipulation, we conclude petitioner has failed to satisfy both prongs of the *Nash* test with respect to these statements. Parties cannot properly bind the court as to the law governing their case or applicable to a given state of facts. *E.g., State v. Boggs*, 103 Ariz. 328, 441 P.2d 778 (1968); *Word v. Motorola, Inc.*, 135 Ariz. 517, 662 P.2d 1024 (1983); *State Consol. Pub. Co. v. Hill*, 39 Ariz. 163, 4 P.2d 668 (1931). The court should not regard these stipulations when they are made, as it is the court's duty to decide the applicable law. *Boggs, supra.*

Under the first prong of *Nash*, we must determine whether counsel's performance was reasonable under prevailing professional norms. We note that under *Nash, supra,* the accused must overcome a "strong" presumption that the challenged action was sound trial strategy under the circumstances. The manner in which cross-examination is conducted is a tactical decision to be made by the lawyer. *State v. Tison,* 129 Ariz. 546, 633 P.2d 355 (1981). Disagreements as to trial strategy or errors in trial will not support a claim of ineffective assistance of counsel so long as the challenged conduct could have some reasoned basis. *State v. Meeker,* 143 Ariz. 256, 693 P.2d 911 (1984).

We think appellant has failed to overcome the strong presumption that counsel's conduct was sound trial strategy and therefore did not fall below prevailing professional norms. We find the cross-examination had some reasoned basis. First, defense counsel may have pursued the inquiry because he sought to bolster appellant's credibility. His purpose appears to have been to show that when a Mormon wears the endowment garments, he is not supposed to commit crimes, the inference being petitioner would not have committed the crime he was accused of when wearing the garments. We note that had the prosecutor objected to this attempt to bolster appellant's credibility, the evidence would not have been admitted. *State v. Marvin,* 124 Ariz. 555, 606 P.2d 406 (1980). However, no such objection was made. Secondly, the cross-examination could also be viewed as an effort to counter the victim's identification of the defendant as wearing church garments during the commission of the offense. If this were his true aim, the evidence would be admissible. It too would show counsel had some reasoned basis for his strategy.

As to the second prong of the *Nash* test, because the religious references might have helped the defendant, either to bolster his credibility or to counter evidence of identification, we cannot conclude the verdict would have been different but for counsel's actions. Simply because his use of religious references may have been unsuccessful, it is insufficient to support a claim that the verdict would have been different had they not been made.

Review granted; relief denied.

CONTRERAS, P.J., and GRANT, J., concur.

NOTE: PAUL G. ULRICH was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz.Const. Art. VI, § 3 and A.R.S. §§ 12–145–47.