NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

VINCENT EDWARD WINSTON, *Appellant.*

No. 1 CA-CR 21-0495
FILED 9-26-2023

Appeal from the Superior Court in Maricopa County
No.  CR2011-007477-002
The Honorable Jo Lynn Gentry, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Ashley Torkelson Levine
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Jesse Finn Turner
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Kent E. Cattani delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Anni Hill Foster joined.

---

**C A T T A N I**, Judge:

¶1   Vincent Edward Winston appeals his convictions and sentences for sexual assault, kidnapping, sexual abuse, and assault. For reasons that follow, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

¶2   Winston and his then-girlfriend Adrienne Kitcheyan had an "open" relationship and regularly sought out sexual encounters with other women. Kitcheyan described Winston as an aggressive and demanding person, admitting that "anything he wanted me to do, I would do."

¶3   In April 2011, Winston and Kitcheyan saw Sasha[1] at a gas station asking other patrons for a ride. The couple agreed to drive Sasha to her friend's house and then invited her to spend time with them. The group drove around the Phoenix area, smoking marijuana and drinking alcohol.

¶4   At some point, Sasha became impaired and vomited in the backseat. A frustrated Winston dropped Kitcheyan and Sasha off at the couple's apartment and left to get more alcohol. Once inside, Kitcheyan told Sasha to remove her clothes so they could wipe off the vomit. Kitcheyan rubbed a towel over Sasha's entire body, including her genital area. Kitcheyan wrapped Sasha in a clean towel and took her to the bedroom. Although Sasha did not explicitly refuse, she froze at Kitcheyan's touch and did not appear interested in sexual activity.

¶5   When Winston arrived at the apartment, he sat in a chair near the bed. The couple poured Sasha a strong alcoholic drink, intending to further impair her. Kitcheyan undressed and began touching Sasha's breast and stomach area. Sasha did not appear interested in this contact and asked to be taken home. Winston exclaimed, "you should slap the shit out of her." Kitcheyan then hit Sasha in the face, and Winston hit her in the leg, grabbed her by the throat, and moved her to the middle of the bed. Kitcheyan later

---

[1]  We use a pseudonym to protect the victim's privacy.

admitted that, from then on, she knew Sasha had not consented and acted only out of fear.

**¶6**     Winston forced Sasha to engage in oral sexual contact with Kitcheyan while he digitally penetrated her genitals. When Winston inserted his penis in Sasha's genitals, she asked him to stop and insisted that she could not engage in sexual intercourse. Sasha attempted to fight Winston and Kitcheyan off, but they held her down until she complied. The assault continued for what "felt like hours," with Winston digitally penetrating both women and ordering them to engage in oral sexual contact.

**¶7**     Sasha waited for Winston and Kitcheyan to fall asleep before running from the apartment, leaving her clothes and purse behind. Sasha found a security guard parked nearby, told him she had been sexually assaulted, and asked for help. When police officers arrived, Sasha was wearing only a towel and appeared to be visibly upset. Officers took Sasha for an examination by a forensic nurse, who observed injuries consistent with an assault and collected swabs for DNA testing. Although Sasha expressed some reluctance to prosecute, she cooperated with the investigation and disclosed details of the assault.

**¶8**     The morning after the assault, Winston and Kitcheyan awoke to find that Sasha had left the apartment. Winston quickly discarded Sasha's belongings and the vomit-stained towel in the apartment complex's dumpster, items that would later be retrieved by officers. When the couple learned that officers were looking for them, they fled to Globe, Arizona. Winston instructed Kitcheyan to lie if ever questioned by officers and claim that Sasha had been a consenting sex worker.

**¶9**     In May 2011, Winston and Kitcheyan were arrested on unrelated charges in Globe. Those charges arose after a vulnerable adult victim reported that the couple took her to their motor home, gave her alcohol, and touched her breast and genital area. Winston and Kitcheyan pled no contest to vulnerable adult abuse in that case.

**¶10**     Officers subsequently traveled to Globe to question Winston about the current case, and he responded by denying that he knew Sasha or that he had engaged in any sexual activity with her. Kitcheyan admitted to knowing Sasha but declined to answer any questions about her. Sasha identified both suspects in a photo lineup.

**¶11**     Forensic scientists subjected the swabs taken from Sasha to DNA testing, locating sperm cells on the external genital swab. Winston's

DNA profile matched the profile obtained from Sasha's external genital swab, as well as profiles from her chest, forehead, and circumoral swabs. Kitcheyan's DNA profile matched the profile obtained from Sasha's chest and circumoral swabs.

**¶12**        The State charged Winston with five counts of sexual assault, class 2 felonies, one count of kidnapping, a class 2 felony, one count of sexual abuse, a class 5 felony, and two counts of assault, class 3 misdemeanors. Kitcheyan, who the State charged as a co-defendant, entered a plea agreement. As part of that agreement, she agreed to testify at Winston's trial.

**¶13**        Winston waived his right to counsel and elected to represent himself in a 20-day jury trial. The victim testified at trial, as did Kitcheyan. Additionally, the State presented expert testimony about the DNA results and the victim's forensic nurse examination. Winston called two defense experts to challenge that evidence.

**¶14**        The jury found Winston guilty as charged. After finding Winston had at least two prior felony convictions, the superior court sentenced him to an aggregate term of 78.75 years' imprisonment. Winston timely appealed, and we have jurisdiction under A.R.S. § 13-4033(A)(1).

## DISCUSSION

### I.        Testimony Regarding the Victim's Religious Faith.

**¶15**        Winston argues that the State improperly emphasized the victim's religious faith, thereby bolstering her credibility. Because Winston failed to object to the testimony at issue, he is not entitled to relief absent fundamental error. *State v. Escalante*, 245 Ariz. 135, 140, ¶ 12 (2018). To establish fundamental error, Winston must show error that (1) went to the foundation of his case, (2) denied him a right essential to his defense, or (3) was so egregious as to deny the possibility of a fair trial. *Id.* at 142, ¶ 21. Under the first two prongs, he must also show prejudice. *Id.*

**¶16**        During Sasha's trial testimony, she acknowledged an initial reluctance to seek prosecution. On cross-examination, Winston asked Sasha to explain this hesitancy and she stated that her religious faith allowed her to feel empathy for her perpetrators. Winston questioned Sasha about her mental health, eliciting testimony that she experienced depression and "grandiose delusions." Sasha explained that her religious faith caused her to place unfounded trust in others and to believe that even

4

damaging events are "part of God's plan," which some may find delusional.

¶17            On redirect, Sasha clarified that her use of the term delusional did not mean she had inaccurately perceived the assault.  She explained that her religious faith made her act in ways that seemed counter-intuitive or illogical.  At the close of Sasha's testimony, a juror posed a question on the topic, and Sasha repeated that her religious faith led her to place unwarranted trust in her perpetrators.  Later, in closing argument, the State explained that Sasha's hesitancy in seeking prosecution stemmed from a religious belief that all people are inherently "good."  The State argued that Sasha's statement about delusional thinking did not mean she hallucinated the assault, but that she believed it to be part of "God's plan."

¶18            Testimony regarding a witness's religious beliefs is inadmissible for the purpose of bolstering their credibility.  Ariz. R. Evid. 610; *see also Thomas*, 130 Ariz. at 436 (noting the Arizona Constitution's "direct prohibition" against eliciting such testimony) (citation omitted).  We have held, however, that where religious faith evidence "is probative of something other than veracity, it is not inadmissible simply because it may also involve a religious subject as well."  *State v. Stone*, 151 Ariz. 455, 458–59 (App. 1986) (finding religious faith evidence admissible to provide context for the witness's identification of the suspect); *State v. Crum*, 150 Ariz. 244, 246 (App. 1986) (finding religious faith evidence admissible to prove the defendant's method of gaining access to victims).  Moreover, the admission of objectionable testimony does not result in error if the defendant "opens the door to further inquiry."  *State v. Garcia*, 133 Ariz. 522, 525–26 (1982).

¶19            Here, Winston sought to weaken Sasha's credibility on cross-examination by focusing on her initial reluctance to seek prosecution and what she referred to as "grandiose delusions."  Sasha explained that her counter-intuitive behavior, placing trust in and feeling empathy for her perpetrators, stemmed from her religious faith.  This opened the door to further clarification from the State on redirect,  specifically to contextualize Sasha's behavior and negate any implication that she hallucinated the assault.  *See Garcia*, 133 Ariz. at 525–26.  Here, the religious faith evidence helped explain why the victim got into a car with strangers, felt she could trust them, and later felt hesitant to seek punishment.  Such testimony was "probative of something other than veracity."  *See Stone*, 151 Ariz. at 458. We find no error, fundamental or otherwise.

## II. Alleged Prosecutorial Error.[2]

**¶20** Winston argues the State committed prosecutorial error by (1) presenting religious faith evidence and (2) denigrating defense experts by focusing on their compensation and appealing to jurors as taxpayers. Winston did not object to the alleged instances of prosecutorial error at trial, so we review solely for fundamental error. *State v. Arias*, 248 Ariz. 546, 555, ¶ 31 (App. 2020). To warrant reversal, prosecutorial error must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26 (1998) (citation and internal quotation marks omitted).

**¶21** The State may not appeal to the "emotions, prejudices, or passions" of the jury to obtain a guilty verdict. *State v. Acuna Valenzuela*, 245 Ariz. 197, 222, ¶ 109 (2018). That said, counsel is given "wide latitude" in offering closing argument, *State v. Gonzales*, 105 Ariz. 434, 436–37 (1970), impeaching witnesses on cross-examination, *State v. Torres*, 97 Ariz. 364, 366 (1965), and presenting "fair rebuttal to areas opened by the defense," *State v. Alvarez*, 145 Ariz. 370, 373 (1985). The use of "excessive and emotional language is the bread and butter weapon of counsel's forensic arsenal" in arguing their case to the jury. *Gonzales*, 105 Ariz. at 437.

### A. The State's Use of Religious Faith Evidence.

**¶22** As addressed above, the State must not make "deliberate references" to the victim's religious faith to bolster the "inherent believability" of their version of events. *Thomas*, 130 Ariz. at 435–37 (finding reversible error where the State argued the victim should be believed because of her "religious, moralistic" upbringing). Here, the State did not use the challenged testimony to argue Sasha should be believed based on her religious faith. The State presented fair rebuttal to Winston's questions on cross-examination, using the testimony to explain Sasha's behavior before, during, and after the assault. *See Alvarez*, 145 Ariz. at 373; *Gonzales*, 105 Ariz. at 436–37. We find no error.

### B. The State's Treatment of Defense Experts.

**¶23** The State's experts testified about the results of the DNA testing and forensic nurse examination. In turn, Winston called two defense

---

[2] Winston does not allege that the prosecutor acted in violation of the ethical rules. We therefore frame our discussion in terms of prosecutorial error rather than misconduct. *See In re Martinez*, 248 Ariz. 458, 469–70, ¶¶ 46–47 (2020).

experts to challenge their methods and findings. Winston's DNA expert testified that he disagreed with the State's experts and did not find conclusive results linking Winston to the assault. But the expert had not conducted the full scope of available testing and used an older, less sensitive instrument to develop his results. Winston's other expert, a forensic nurse, criticized aspects of the physical examination and the DNA analysis, and she noted a lack of injury to Sasha's genital area. But the nurse conceded that the physical examination conducted at the direction of law enforcement officers followed Arizona protocol, and that not all sexual assaults result in injury. Both of Winston's experts testified that they were paid $250 per hour for their testimony.

¶24        On cross-examination, the State elicited testimony from Winston's DNA expert that "Arizona taxpayers" would pay him approximately $58,000 for his testimony. The expert agreed that the people "sitting here" paid for his fees but added that it was the same people paying the State's salary, as well as the "millions of dollars that are spent every day" on criminal investigations. The State asked whether the expert provided Winston with a list of questions for trial, asking if this was akin to writing his "own paycheck." The expert explained that he only wanted to help Winston educate the jury on the science behind his findings. The State questioned the expert about his laboratory's lack of accreditation and outside proficiency testing, asking if "the fox is looking after the henhouse." The expert stated he had "no idea" what that meant, and the State moved on to another line of questioning.

¶25        Later, in closing argument, the State criticized the findings of Winston's DNA expert, highlighting his economic benefit, bias toward the defense, use of expensive trial tactics, and lack of accreditation and oversight. Similarly, the State argued Winston's forensic nurse "will be paid a considerable fee for her testimony," arguing she had a bias for the defense. In Winston's closing argument, he countered that the State used its "unlimited amount of resources" to investigate and prosecute this case.

¶26        Recognizing ethical limits to the State's cross-examination of defense experts, our courts have found it improper for the State to "attack the expert with non-evidence, using irrelevant, insulting cross-examination and baseless argument designed to mislead the jury." *In re Zawada*, 208 Ariz. 232, 237, ¶¶ 14–16 (2004). The State is barred from intimating "that an expert is unethical or incompetent without properly admitted evidence to support it." *State v. Bailey*, 132 Ariz. 472, 479 (1982). Similarly, the State should refrain from suggesting, absent supporting evidence, that an expert "colluded with the defense to fabricate" results or "reached conclusions

merely for pecuniary gain." *State v. Manuel*, 229 Ariz. 1, 7, ¶¶ 31–32 (2011). The State, however, may cross-examine an expert regarding compensation, *id*. ¶ 29, highlight potential biases, *Bailey*, 132 Ariz. At 478, and challenge "the validity of their opinions," *City of Tucson v. LaForge*, 8 Ariz. App. 413, 417 (App. 1968).

**¶27** Here, to the extent the State questioned the defense experts in a way that challenged their opinions and potential biases, we find no error. The bulk of the State's remarks fell within the scope of proper cross-examination and closing argument, with the State attacking the weaknesses in the expert's testing methods and emphasizing any conclusions that aligned with the State's case. *See LaForge*, 8 Ariz. App. At 417. While the State underscored compensation, the State did not argue that experts colluded with the defense or received payment to fabricate an exculpating conclusion. *See Manuel*, 229 Ariz. at 7, ¶¶ 31–32. These comments fell within the "great latitude" afforded counsel in impeaching the credibility of witnesses and presenting closing argument. *See Torres*, 97 Ariz. at 366.

**¶28** The State concedes, and we agree, that the prosecutor's appeal to the jurors as taxpayers was improper. Other jurisdictions have likewise found such remarks to be improper. *See United States v. Smyth*, 556 F.2d 1179, 1185 (5th Cir. 1977) (recognizing prosecutor's appeal to jurors as taxpayers as "highly improper"); *State v. Fears*, 86 Ohio St. 3d 329, 334 (1999) (recognizing prosecutor's comment that defense expert had been paid by taxpayers as improper); *McGuire v. State*, 100 Nev. 153, 157 (1984) (recognizing prosecutor's comment that defense expert "had been paid for at county expense by such persons as the jurors themselves" to be "highly improper").

**¶29** Nevertheless, the State's emphasis on the role of taxpayers in compensating experts here did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Hughes*, 193 Ariz. at 79, ¶ 26. The testimony revealed that many aspects of the case required taxpayer funds, including compensation for experts on both sides, law enforcement, and counsel for the State. Any comment by the State regarding the cost of defense experts to the county and taxpayers had support in the evidence, and likely cut both ways in impacting the credibility of witnesses for the State and defense. The superior court instructed the jury that statements made by counsel are not evidence, and we presume that the jury follows the court's instructions. *See State v. Newell*, 212 Ariz. 389, 403, ¶ 68 (2006). Thus, the error here did not rise to the level of fundamental, prejudicial error.

### III.     Preclusion of Certain Comments on Winston's Innocence.

**¶30**          Winston contends that the superior court abused its discretion by preventing him from informing the jury of his innocence in opening statements and closing argument.  We review such rulings for an abuse of discretion.  *State v. Johnson*, 247 Ariz. 166, 182, ¶ 22 (2019); *State v. Prewitt*, 104 Ariz. 326, 333 (1969).

**¶31**          Although Winston chose not to testify, he made speaking objections and declarative statements throughout trial, injecting his own version of events, pleading his innocence, and discussing precluded evidence.  Before opening statements, the superior court warned Winston that he could discuss what the evidence would show, but could not give declarative statements like, "I'm innocent."  Nonetheless, in Winston's opening statements, he proclaimed, "I am innocent and I will prove it" and accused the State of charging "an innocent man."  In closing argument, he argued, "I am innocent" and "I am falsely accused and charged with the crimes I did not commit."  The court sustained the State's objection to facts not in evidence, explaining that Winston could only discuss the evidence and provide his opinion.  Later, without objection, Winston repeatedly argued the evidence supported his innocence, painted the victim as a liar, and claimed "mistakes" in the investigation could "send an innocent man to prison."

**¶32**          A defendant is entitled to make opening statements and closing argument.  Ariz. R. Crim. P. 19.1(b)(3),(7).  Opening statements provide the defendant an opportunity to advise the jury of his theory of the case and give context for the evidence to be admitted at trial.  *State v. Pedroza-Perez*, 240 Ariz. 114, 116, ¶ 9 (2016).  Closing argument allows the defendant to persuade the jury on the issue of reasonable doubt, "sharpen and clarify the issues," and highlight any weaknesses in the State's case.  *Herring v. New York*, 422 U.S. 853, 862 (1975).  Such remarks, however, are not without limits.  A party's opening statements should contain only facts that will be supported by evidence, *Pedroza-Perez*, 240 Ariz. at 116, ¶ 10, and closing argument should contain only facts that have been introduced in evidence, *State v. Zaragoza*, 135 Ariz. 63, 68 (1983).

**¶33**          The superior court did not abuse its discretion here.  Throughout trial, Winston used speaking objections and declarative statements to present his theory of the case—that the victim lied and he did not commit the assault.  Within the scope of opening statements and closing argument, Winston repeated these assertions, impugning the victim's character and claiming the State charged an innocent man.  When not

directly tied to evidence presented at trial, such assertions exceeded the scope of proper opening statements and closing argument. Winston could not use opening and closing remarks as an opportunity to testify without being subject to cross-examination. *See State v. Cornell*, 179 Ariz. 314, 331 (1994) ("[D]efendant acting in propria persona is subject to the same rules as an attorney."); *Acuna Valenzuela*, 245 Ariz. at 216–17, ¶ 71 (noting that counsel may not use closing argument to convey personal beliefs or testify about facts not in evidence).

¶34        Moreover, the court allowed Winston to assert his innocence throughout trial, many times without objection or constraint. The court's modest limitation on Winston's remarks during his opening statements and his closing argument did not negate the presumption of innocence or prevent him from proclaiming his innocence. In the context of substantial evidence of Winston's guilt, a minimal restraint on his opening statements and closing argument, even assuming error, did not affect the verdicts. *See State v. Bible*, 175 Ariz. 549, 588 (1993) (noting that we will affirm a defendant's convictions despite error if the State establishes "beyond a reasonable doubt[] that the error did not contribute to or affect the verdict").

¶35        We further reject any claim of structural error. The relatively minor limit placed on Winston's opening statements and closing argument did not, as Winston suggests, violate his autonomy in deciding how to present his own defense or impose negative consequences based on his decision to represent himself. Winston presented his chosen defense, calling expert witnesses, providing extensive argument to the jury, and asserting his innocence. Any constraint on Winston's remarks did not reach the level of severity needed to establish structural error. *See Johnson v. United States*, 520 U.S. 461, 468 (1997) ("We have found structural errors only in a very limited class of cases."); *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (defining "structural error" as a "defect affecting the framework within which the trial proceeds").

## IV.    Admission of Co-Defendant's Plea Agreement.

¶36        Winston claims that the superior court erred by allowing the State to introduce his co-defendant's plea agreement, which referred to events occurring in Globe. He claims the language constituted impermissible other-act evidence under Rule 404(b) and (c), which the court had precluded.

¶37        Before trial, Winston opposed admission of other-act evidence related to the Globe case, which would ordinarily preserve the

issue for appeal, *State v. Lindsey*, 149 Ariz. 472, 475–76 (1986). But that rule applies only if the superior court denied the challenge; the issue is not preserved where, as here, the court sided with the defendant and the State allegedly violated the court's order without objection. *Id.*; *see also State v. Sharp*, 193 Ariz. 414, 421, ¶ 22 (1999). Because Winston reviewed the plea agreement and stipulated to its admission, he waived any challenge to its presentation to the jurors. *See State v. Rockwell*, 161 Ariz. 5, 10 (1989). We thus review only for fundamental error. *See Escalante*, 245 Ariz. at 140, 142, ¶¶ 12, 21.

¶38 The State moved in limine to admit other-act evidence related to the Globe case under Arizona Rule of Evidence ("Rule") 404(b) and (c). Winston objected, arguing the evidence would be misleading and unduly prejudicial. The superior court denied the State's motion and precluded any mention of the other acts associated with the Globe case. The court noted that the State could refer to Winston and Kitcheyan travelling to Globe, where they were eventually arrested, without discussing the other case.

¶39 Kitcheyan testified for the State, admitting to her role in the assault. She admitted to entering a plea agreement, a condition of which required her to speak with officers and testify at trial. The State moved to admit the plea agreement as an exhibit, which contained language that Kitcheyan agreed to speak about "the events giving rise to this case" and testify at trial "about these events and related events in Globe, Arizona." No other portion of the plea agreement referred to Globe. Upon reviewing the plea agreement, Winston conceded that the exhibit "could be admitted." Without mentioning the other case, Kitcheyan testified that the couple fled to and were arrested in Globe.

¶40 Generally, other-act evidence is inadmissible unless offered for a non-propensity purpose or to show an aberrant sexual propensity to commit the charged crimes. Ariz. R. Evid. 404(b)(1)–(2), (c). The introduction of otherwise inadmissible other-act evidence does not require reversal if the record discloses no reasonable probability the "evidence materially affected the outcome of the trial." *State v. Gilfillan*, 196 Ariz. 396, 406, ¶ 38 (App. 2000); *see also State v. Jones*, 197 Ariz. 290, 304, ¶ 32 (2000). This is especially true when any reference to such evidence was brief and inadvertent, *State v. Stuard*, 176 Ariz. 589, 601–02 (1993), and the evidence was neither emphasized nor mentioned in closing argument, *State v. Wood*, 180 Ariz. 53, 64 (1994). We have previously held that an isolated and "relatively innocuous" reference to a defendant's criminal history or

unrelated criminal case does not result in reversible error. *State v. Bailey*, 160 Ariz. 277, 280 (1989).

**¶41**        Here, aside from admitting the plea agreement as an exhibit during Kitcheyan's testimony, the State did not emphasize or rely on the plea agreement's reference to Globe. On this record, we conclude that the brief and inadvertent mention of events occurring in Globe did not affect the outcome of trial. *See Jones*, 197 Ariz. at 305, ¶ 34. First, the phrase "related events" did not suggest that Winston had a separate criminal case in Globe, especially given that portions of the current case (including Winston's instruction to Kitcheyan to lie if questioned by the police) occurred in that jurisdiction. Second, nothing from the record shows the State intentionally inserted the phrase to circumvent the superior court's preclusion order. *Id.* at 304, ¶¶ 31–33 (finding unsolicited testimony that the defendant had been in jail did not require a mistrial). While the reference to Globe should have been excised from the plea agreement before trial, the vague and nonprejudicial nature of the language did not result in fundamental error. *See Stuard*, 176 Ariz. at 600–02 (finding brief, yet improper reference to prior incarceration did not constitute fundamental error).

## CONCLUSION

**¶42**        For the foregoing reasons, we affirm Winston's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:    AA